UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **DIAGNOSTIC HEALTHCARE SERVICES, INC.,** | § § § § § | |
| Plaintiff, | § | |
| v. | § § | Misc. Action No. 4:24-MC-01535 |
| **DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF INSPECTOR GENERAL,** | § § § § § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Diagnostic Healthcare Services, Inc. ("Diagnostic") does administrative work for nonparty Texas Neurodiagnostic Associates, Inc. ("Texas Neurodiagnostic"). Last year, Texas Neurodiagnostic settled with the United States Department of Health and Human Services, Office of Inspector General ("OIG") over allegedly unnecessary neurodiagnostic tests billed to Medicare. Diagnostic was not a party to the settlement agreement.

In August, OIG served an administrative subpoena on Diagnostic in connection with an investigation of the company and its owners. Diagnostic now moves to quash the subpoena. Diagnostic argues that it is "functionally inseparable" from Texas Neurodiagnostic and that Texas Neurodiagnostic's settlement agreement with OIG precludes the subpoena. OIG responds that Diagnostic was not a party to the settlement agreement and that, in any event, its investigation into Diagnostic concerns conduct not covered by the settlement agreement. OIG cross-moves to enforce the subpoena.

Before the Court are Diagnostic's Motion to Quash Subpoena to Diagnostic Healthcare Services, Inc., (Dkt. No. 1), and OIG's Cross-Motion to Enforce Administrative Subpoena, (Dkt. No. 5). For the reasons below, the Court **DENIES** Diagnostic's Motion and **GRANTS** OIG's Motion.

I.   FACTS

This case involves a dispute between Diagnostic and OIG over an administrative subpoena that OIG issued to Diagnostic in August 2024. (Dkt. No. 1 at 1). The subpoena is part of an ongoing investigation into potential statutory violations. (*Id.*); (Dkt. No. 5 at 4). Diagnostic is a Texas-based management company that provides nonclinical administrative services. (Dkt. No. 1 at 2). Diagnostic works mainly for Texas Neurodiagnostic, an independent diagnostic testing company specializing in neurodiagnostic testing services that are billed to Medicare. (Dkt. No. 1 at 1–2); (Dkt. No. 5 at 7). Lindsey Jackson, M.D., owns 75% of Diagnostic, and her husband, James Jackson, owns the remaining 25%. (Dkt. No. 6–2 at 6). Texas Neurodiagnostic, meanwhile, is wholly owned by James Jackson. (*Id.* at 5).

In 2023, OIG investigated Texas Neurodiagnostic for billing allegedly unnecessary neurodiagnostic tests to Medicare between 2015 and 2019. (Dkt. No. 5 at 7); (Dkt. No. 1 at 2). That investigation was resolved without formal proceedings through a settlement agreement signed on May 24, 2023. (Dkt. No. 1 at 2); (Dkt. No. 5 at 7). Texas Neurodiagnostic agreed to pay $617,254.84 to resolve 5,783 specific claims identified by OIG. (Dkt. No. 1-1 at 2–3, 8); (Dkt. No. 6-3 at 2–3, 7–8). The agreement limited the

settlement to Texas Neurodiagnostic's conduct from 2015 through 2019 and covered only the 5,783 identified claims. (Dkt. No. 1-1 at 2–3); (Dkt. No. 6-3 at 2–3).

Then, on August 28, 2024, OIG served an administrative subpoena on Diagnostic. (Dkt. No. 6-1 at 3, 8–9, 12–13). The subpoena seeks financial records, contractual agreements, and communications from January 1, 2015, to August 26, 2024. (*Id.*). It requests documents detailing transactions in Diagnostic's general ledger accounts, agreements related to office space leasing, contracts with specific marketing individuals and entities, and any emails mentioning Lindsey Jackson. (*Id.* at 12–13). OIG's investigation focuses primarily on "whether Diagnostic and the [other individuals under investigation] solicited, received, or offered remuneration to induce referrals of patients for items or services payable under the Federal Health Care Programs." (Dkt. No. 5 at 23).

On September 24, 2024, Diagnostic moved to quash the subpoena. (Dkt. No. 1). Diagnostic contends that its close operational and financial ties to Texas Neurodiagnostic bring Diagnostic within the protections of the prior settlement. (*Id.* at 1, 4–6). Separately, Diagnostic asserts that the document requests are unduly burdensome and overbroad. (*Id.* at 8–11).

## II.   LEGAL STANDARD

"[W]hen reviewing an administrative subpoena, the court plays a 'strictly limited' role." *Sandsend Fin. Consultants, Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875, 879 (5th Cir. 1989) (quoting *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977)). "[C]ourts will enforce an administrative subpoena issued in aid of an investigation if: '(1) the subpoena

3

is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome.'" *United States v. Zadeh*, 820 F.3d 746, 755 (5th Cir. 2016) (quoting *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 488 (5th Cir. 2014)).

The Fifth Circuit "has consistently recognized the summary nature of administrative subpoena enforcement proceedings." *Burlington N. R.R. Co. v. OIG*, 983 F.2d 631, 637 (5th Cir. 1993). As a result, "[t]he government need only make a prima facie showing" that the subpoena is lawful and appropriate, "at which point the party opposing enforcement bears the 'heavy burden' of demonstrating that the government has not met this standard." *Zadeh*, 820 F.3d at 757 (quoting *Mazurek v. United States*, 271 F.3d 226, 229–30 (5th Cir. 2001)). The government's "burden to make a prima facie case is 'minimal.'" *Transocean Deepwater Drilling*, 767 F.3d at 489 (quoting *United States v. Tex. Heart Inst.*, 755 F.2d 469, 474 (5th Cir. 1985), *overruled on other grounds by United States v. Barrett*, 837 F.2d 1341 (5th Cir. 1988) (en banc)).

### III.   DISCUSSION

Because the government must first make a prima facie showing that the subpoena is lawful and appropriate, the Court begins with OIG's arguments that the subpoena is enforceable before turning to Diagnostic's arguments that it is not.

#### A.   OIG'S PRIMA FACIE SHOWING

##### 1.   Statutory authority

The first question is whether the subpoena was within the statutory authority of the issuing agency. *Zadeh*, 820 F.3d at 755; *Winters Ranch P'ship v. Viadero*, 123 F.3d 327,

4

329 (5th Cir. 1997). OIG argues that the subpoena issued to Diagnostic was for a lawful purpose and squarely within OIG's authority as the investigative arm of the Department of Health and Human Services, which is charged with preventing fraud, waste, and abuse in federal healthcare programs. (Dkt. No. 5 at 5–6, 8, 12–13) (citing 5 U.S.C. § 402(b)). The Court agrees.

Under its statutory mandate, OIG is empowered "to conduct . . . investigations relating to the programs and operations of the establishments listed in section 401(1)" of Title 5 of the U.S. Code and "to prevent and detect fraud and abuse in those programs and operations." 5 U.S.C. § 402(b). One of the "establishments" listed in Section 401(1) of Title 5 is Health and Human Services ("HHS"). 5 U.S.C. § 401(1). And by delegation of the HHS Secretary, OIG is empowered to investigate violations of specific federal statutes, including: (1) the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a(j); (2) the Exclusions Statute, 42 U.S.C. § 1320a-7(f)(4); and (3) the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), as incorporated into the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a(a)(7). *See* 76 Fed. Reg. 13619 (Mar. 14, 2011) (delegating investigative authority to OIG).

What's more, Congress expressly authorizes OIG "to require by subpoena the production of all information, documents, reports, answers, records, accounts, papers, and other data in any medium (including electronically stored information), as well as any tangible thing and documentary evidence necessary in the performance of the functions assigned by this chapter." 5 U.S.C § 406(a)(4). And "in the case of contumacy

5

or refusal to obey, [the subpoena] shall be enforceable by order of any appropriate United States district court." *Id.*

The subpoena to Diagnostic cites OIG's authority under Section 406(a)(4),[1] (Dkt. No. 6-1 at 3, 6), and states that the subpoena was issued "in connection with an investigation being conducted by the Inspector General of potential violations of the Civil Monetary Penalties Law," (*id.* at 6). Accordingly, the Court finds that OIG has made its minimal prima facie showing that the subpoena was within its statutory authority. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 584 (D.C. Cir. 2001) ("Unless it is *patently clear* that an agency lacks the jurisdiction that it seeks to assert, an investigative subpoena will be enforced." (emphasis added)).

### 2. Reasonably relevant

The next question is whether the information sought is reasonably relevant to the inquiry. *Zadeh*, 820 F.3d at 755. "For purposes of an administrative subpoena, the notion of relevancy is a broad one." *Sandsend*, 878 F.2d at 882. "An agency 'can investigate merely on the suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *Id.* (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950)). "So long as the material requested 'touches a matter under investigation,' an administrative subpoena will survive a challenge that the material is not relevant." *Id.* (some internal quotations omitted) (quoting *EEOC v. Elrod*, 674 F.2d 601, 613 (7th Cir. 1982)).

---

[1] The subpoena cites 5 U.S.C. App. 3 § 6(a)(4), (Dkt. No. 6-1 at 3, 6), which was the former citation for 5 U.S.C. § 406, *see* 5 U.S.C. § 406 (noting former citation as 5 U.S.C. App. 3 § 6).

OIG is investigating whether Diagnostic, its owners—James and Lindsey Jackson—or others potentially violated (1) the Civil Monetary Penalties Law,[2] including (2) its Anti-Kickback Statute,[3] or (3) the Exclusions Statute.[4]  (Dkt. No. 6-1 at 6); (Dkt. No. 5 at 6–8, 13–15).  The Civil Monetary Penalties Statute provides civil penalties for fraudulent or deceptive conduct related to healthcare billing, benefits, and payments.  42 U.S.C. § 1320a–7a.  The statute also provides penalties for kickbacks, 42 U.S.C. § 1320a–7b(b), which is a focus of OIG's investigation, (Dkt. No. 6-1 at 6); (Dkt. No. 5 at 6, 14, 23).  The Exclusions Statute, meanwhile, excludes certain individuals and entities from participation in Medicare and state healthcare programs.  42 U.S.C. § 1320a-7.

To investigate whether Diagnostic or its owners violated these statutes, OIG's subpoena requests five categories of documents: (1) documents related to transactions for three specifically identified general ledger accounts; (2) written agreements between Diagnostic and third parties for leasing office space; (3) written agreements between Diagnostic and contract marketers; (4) remittance advices and Internal Revenue Service forms related to Diagnostic's payments to contract marketers; and (5) emails that "mention, refer to, or discuss" Lindsey Jackson.  (Dkt. No. 6-1 at 12–13).

OIG explains that the first four categories of documents are relevant because the alleged statutory violations "necessarily implicate[] agreements, as well as financial, tax, and accounting records, due to elements that must be proven."  (Dkt. No. 5 at 14).  OIG

---

[2]  42 U.S.C. § 1320a–7a.
[3]  42 U.S.C. § 1320a–7b.
[4]  42 U.S.C. § 1320a–7.

claims that these documents will help determine whether individuals or entities associated with Diagnostic received or provided payments intended to influence medical referrals, a core concern in antikickback investigations. (*Id.* at 12–15, 23).

The fifth category, according to OIG, "is relevant to the 'who' question in the investigation"—in other words, "which individuals were responsible for conducting the operations of [Diagnostic's] business, including potentially, the payment of illegal kickbacks." (*Id.* at 15). Witnesses have testified that Lindsey Jackson is not involved in company operations or decisions. (Dkt. No. 6-2 at 9); (Dkt. No. 6-4 at 6–7). But she is Diagnostic's majority owner, (6-2 at 6); (Dkt. No. 6-4 at 6–7), and testified in an OIG investigational inquiry that she has discussed Diagnostic's finances with others, (Dkt. No. 6-5 at 5). Thus, OIG claims that the emails mentioning Lindsey Jackson are relevant for clarifying her role in the company and assessing whether she participated in or knew about any activities under investigation. (Dkt. No. 5 at 15).

Again, the Court plays a limited role in this summary proceeding. *Zadeh*, 820 F.3d at 757. OIG's burden here is "minimal," *Tex. Heart Inst.*, 755 F.2d at 474, and the concept of relevance in this context is "broad," *Sandsend*, 878 F.2d at 882. The alleged statutory violations involve illicit financial agreements with third parties, (*see* Dkt. No. 5 at 12–15, 23), and the subpoena requests documents relevant to understanding Diagnostic's financial relationship with third parties, (*see* Dkt. No. 6-1 at 12–13). The requested emails are relevant to understanding Lindsey Jackson's day-to-day involvement, if any, in the company she owns. (*See*Dkt. No. 5 at 15).

8

Comparing the nature of the alleged statutory violations under investigation with the nature of the requested documents, the Court finds that OIG has made a prima facie showing that the documents requested are reasonably relevant to the investigation. *See United States v. Apodaca*, 251 F.Supp.3d 1, 12 (D.D.C. 2017) ("In a proceeding to enforce an administrative subpoena, 'the agency's own appraisal of relevancy must be accepted so long as it is not obviously wrong.'" (quoting *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992)).

### 3.     Not unduly broad or burdensome

The final question is whether OIG's demand is unduly broad or burdensome.[5] *Zadeh*, 820 F.3d at 755. "Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *Texaco, Inc.*, 555 F.2d at 882. "[A] subpoena is not unreasonably burdensome unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *FTC v. Jim Walter Corp.*, 651 F.2d 251, 258 (5th Cir. 1981) (quoting *FTC v. Rockefeller*, 591 F.2d 182, 190 (2d Cir. 1979)).

---

[5] The Supreme Court's decision in *McLane Co. v. EEOC* suggests that the unduly-burdensome inquiry is not an element of the government's prima facie case but instead is a part of the respondent's rebuttal. 581 U.S. 72, 77, 137 S.Ct. 1159, 1165, 197 L.Ed.2d 500 (2017), *as revised* (Apr. 3, 2017) ("If the charge is proper and the material requested is relevant, the district court should enforce the subpoena unless *the employer* establishes that the subpoena is . . . unduly burdensome." (emphasis added)).

That approach is sensible, given the summary nature of an administrative-subpoena review and the likely allocation of evidence on this issue. After all, what evidence would the Government possess regarding whether compliance with a subpoena would interfere with the respondent's business operations?

But the Fifth Circuit continues to apply the *Zadeh* factors. *See Consumer Fin. Prot. Bureau v. Source for Pub. Data, L.P.*, 903 F.3d 456, 459 (5th Cir. 2018). And in any event, OIG has more than made its prima facie case on this issue.

9

OIG argues that the subpoena issued to Diagnostic is neither unduly broad nor burdensome because it is tailored to five specific categories of documents that directly relate to the focus of its investigation. (Dkt. No. 5 at 8–9, 16–17). OIG explains that it has limited the document requests to discrete types of financial and contractual records. (*Id.*). This includes specific general ledger accounts, office space leasing agreements, contracts with identified marketers, and emails that mention only one person: Lindsey Jackson, Diagnostic's majority owner. (*Id.*). Each request, according to OIG, is narrowly constructed to avoid an overly broad scope and minimize the burden on Diagnostic while still gathering essential information relevant to the inquiry. (*Id.*).

As for timeframe, OIG argues that the subpoena aligns with the period under investigation. (*Id.* at 16). OIG also highlights that one of the requests—emails mentioning Lindsey Jackson—should be manageable for Diagnostic because Diagnostic representatives testified that Jackson had minimal involvement in business operations. (*Id.*). If true, OIG contends that there would be few responsive emails and notes the "ease with which email searches can be made." (*Id.*).

Given these facially reasonable arguments and the Court's limited role in this summary proceeding, OIG has satisfied its minimal burden to make a prima facie showing that the subpoena would not "unduly disrupt or seriously hinder [the] normal operations" of Diagnostic's business. *See Jim Walter Corp.*, 651 F.2d at 258.

    **B.**    **DIAGNOSTIC'S REBUTTAL**

The burden now shifts to Diagnostic to show that the subpoena is unlawful. *Zadeh*, 820 F.3d at 757. Diagnostic has failed to meet this burden.

Apart from its preclusion arguments, which the Court addresses below, *see infra* Section III(C), Diagnostic focuses primarily on the third element of the administrative-subpoena test: whether the subpoena is unduly broad or unreasonably burdensome, (Dkt. No. 1 at 8–11). Diagnostic argues that the subpoena "place[s] an overwhelming burden on Diagnostic's operations." (*Id.* at 10).

The standard for showing that an administrative subpoena is overbroad or unduly burdensome is "not easily met." *U.S. Commodity Futures Trading Comm'n v. Ekasala*, 62 F.Supp.3d 88, 94 (D.D.C. 2014). "Successful efforts to quash administrative subpoenas are quite rare, as the burden on the respondent to prove that the subpoena is overbroad or unduly burdensome is often difficult to meet." 8 Robert L. Haig, Business and Commercial Litigation in Federal Courts § 91:37 (5th ed. 2022). Thus, when the agency has made out its prima facie case, "judicial review of an administrative subpoena typically results in enforcement." *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017).

"In order to satisfy its burden, the objecting party must make a specific, detailed showing of how a request is burdensome." *SEC v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006). "Broad-based, non-specific objections are almost impossible to assess on their merits, and fall woefully short of the burden that must be borne by a party making an objection to an interrogatory or document request." *Id.*

Further, "a party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request." *Eng. v. Tex. Farm Bureau Bus. Corp.*, 462 F.Supp.3d 667, 671 (W.D. Tex. 2020); *see*

11

*also Brady*, 238 F.R.D. at 437 (applying this rule in the context of an administrative subpoena). The evidence presented must "reveal[] the nature of the burden." *Andra Grp., LP v. JDA Software Grp., Inc.*, 312 F.R.D. 444, 449 (N.D. Tex. 2015); *see also EEOC v. Aerotek, Inc.*, 815 F.3d 328, 334 (7th Cir. 2016) ("[S]peculation is inadequate to establish undue burden . . . ."); *Doe v. United States*, 253 F.3d 256, 269 (6th Cir. 2001) (noting the "general and conclusory" nature of the opposing party's undue-burden argument against the request). "Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Heller v. City of Dallas*, 303 F.R.D. 466, 490 (N.D. Tex. 2014).

Diagnostic offers no evidence supporting its assertions of undue burden or overbreadth. The exhibits in Diagnostic's Reply, (*see* Dkt. Nos. 8-1–8–11), show Diagnostic's close connection with Texas Neurodiagnostic. But they do nothing to establish the burden of complying with the current administrative subpoena.

As to overbreadth, Diagnostic contends that the "subpoena largely seeks underlying documentation for transactions it has already reviewed." (Dkt. No. 8 at 13). First, this concedes that the subpoena "largely seeks" documents that are not already in OIG's possession—the documents underlying the previously reviewed transactions. Second, this argument misunderstands the scope of OIG's investigatory powers. "An agency 'can investigate merely on the suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *Sandsend*, 878 F.2d at 882 (quoting *Morton Salt Co.*, 338 U.S. at 642–43, 70 S.Ct. at 364). It may be that OIG has already reviewed the relevant transactions and relationships in connection with a separate investigation into

different allegations. But that does not preclude OIG from seeking the documentation underlying those relationships and transactions in this investigation. Third, here again, Diagnostic offers no evidence, only the claims it makes in its filings.[6] "Arguments in a brief, like allegations in a complaint, are assertions, not evidence." *Collins v. Jackson Pub. Sch. Dist.*, 609 F.App'x 792, 795 (5th Cir. 2015) (per curiam).

But even if Diagnostic *could* satisfy its burden without evidence, it hasn't. Categories one and four of the subpoena are limited to specific, identifiable types of accounting, tax, and financial records (i.e., three identified general-ledger accounts and named tax documents related to payments to contract marketers, respectively). (Dkt. No. 6-1 at 12–13). Similarly, categories two and three are limited to contracts for specific purposes or between identified or identifiable parties. (*Id.*). Category five, meanwhile, requires a single keyword search. (*See id.* at 13); (Dkt. No. 5 at 16). In other words, OIG's requests are not sweeping or indiscriminate; they are tailored to only a few defined categories, including identified documents and particular contracts with known individuals and entities. Diagnostic cites no case—in any circuit—where a court has rejected a similarly tailored subpoena as overbroad or unduly burdensome.

Finally, Diagnostic asserts that the requested documents are not relevant. (Dkt. No. 1 at 8–11). But, as with its undue burden arguments, it offers no evidence to support

---

[6] Diagnostic's initial Motion included no exhibits. (*See* Dkt. No. 1). The exhibits in Diagnostic's Reply go only to Diagnostic's close connection with Texas Neurodiagnostic. (*See* Dkt. Nos. 8-1–8-11); (*see* Dkt. No. 8 at 4–5) (citing the exhibits only as evidence of the "interrelatedness of those entities" and "of the companies' ownership structure and operational integration").

13

this claim. As noted, Diagnostic's original Motion included no exhibits, (*see id.*), and the exhibits attached to its Reply do not address relevance, (*see* Dkt. Nos. 8-1–8-11); (Dkt. No. 8 at 4–5).

At most, Diagnostic's relevance arguments rhetorically counter the Government's prima facie case rather than provide evidence to rebut it. *See Collins*, 609 F.App'x at 795. If it contends that financial documents are irrelevant to alleged financial crimes, it must support that claim with evidence, bearing in mind that "the notion of relevancy is a broad one" in the context of administrative subpoenas. *Sandsend*, 878 F.2d at 882. Absent this evidence, the arguments do not alter the Court's previous conclusion that the Government's prima facie case regarding the documents' relevance is sufficient. *See supra* Section III(A)(2).

Given the lack of supporting evidence, Diagnostic has failed to meet its "'heavy burden' of demonstrating that" OIG's "demand is . . . unreasonably broad or burdensome" or that the "information sought is [not] reasonably relevant to the inquiry." *Zadeh*, 820 F.3d at 755, 757 (quoting *Mazurek*, 271 F.3d at 229–30).

### C. THE 2023 SETTLEMENT

Diagnostic argues separately that the subpoena should be quashed because of the 2023 settlement agreement between OIG and Texas Neurodiagnostic. (Dkt. No. 1 at 2–6); (Dkt. No. 1-1).[7] Diagnostic asserts that it is an administrative extension of Texas

---

[7] In its initial Motion, Diagnostic framed its argument in terms of res judicata and Rule 19 joinder. (*See* Dkt. No. 1 at 4–8). In its Reply, however, Diagnostic correctly recognized that these doctrines do not apply to an out-of-court settlement raised as a defense to a pre-suit investigative subpoena. (*See* Dkt. No. 8 at 8–9).

14

Neurodiagnostic. (Dkt. No. 1 at 4–5). Because the two entities share such a close functional relationship, Diagnostic argues that they should be treated as a single entity under the settlement's release. (*Id.*). According to Diagnostic, the 2023 settlement agreement was intended to comprehensively resolve claims related to Texas Neurodiagnostic's Medicare billing practices from 2015 through 2019. (Dkt. No. 1 at 5). Diagnostic contends that the settlement prevents OIG from reexamining similar conduct through a new investigation of Diagnostic. (*Id.*).

Diagnostic's reliance on the 2023 settlement agreement is misplaced. The plain terms of the 2023 settlement agreement do not cover Diagnostic or the conduct under investigation.

First, Texas Neurodiagnostic and OIG are the only parties to the settlement:

> 1. <u>Parties.</u> The Parties to this Settlement Agreement (Agreement) are the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS), and Texas Neurodiagnostic Associates, Inc. ("Respondent"). OIG and Respondent shall hereafter collectively be referred to as the "Parties."

(Dkt. No. 1-1 at 2). The settlement agreement twice confirms that it binds and releases *only* the parties:

> 7. <u>Release by the OIG.</u> In consideration of the obligations of Respondent under this Agreement . . . the OIG releases Respondent from any claims or causes of action it may have against Respondent [relating to the covered conduct]. This release is applicable only to the Respondent and is not applicable in any manner to any other individual, partnership, corporation, or entity.
>
> . . . .

> 12. No Additional Releases. This Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity, except as provided in paragraph 13.[8]

(*Id.* at 3–4).

Second, the settlement agreement has an integration clause, which states the document's text is the "complete agreement between the Parties" and that "[a]ll material representations, understandings, and promises" are expressly included. (*Id.* at 4). Interpreting the agreement to include Diagnostic by implication would contradict the integration clause's clear provision that all terms are expressly stated.

Finally, the circumstances surrounding the 2023 settlement agreement suggest that Diagnostic was not included in its scope. Diagnostic contends that "[w]ell before entering into the Settlement Agreement, the parties had discussed Diagnostic's structure and role in Texas Neurodiagnostic's operations." (Dkt. No. 1 at 2). If anything, this shows that Texas Neurodiagnostic and OIG had the option to include Diagnostic in the terms of the settlement agreement but chose not to.

The settlement agreement also narrowly defines the scope of "covered conduct" in its release of liability. The agreement's release covers only the allegation that Texas

---

[8] Paragraph 13 relates to Claims Against Beneficiaries:
> Respondent waives and shall not seek payment, including copay and deductible amounts, for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

(*Id.* at 4).

Neurodiagnostic "submitted 5,783 claims to Medicare for medically unnecessary (1) autonomic nervous system tests, (2) nerve conduction studies, (3) electromyography examinations, and (4) repetitive nerve stimulation tests." (Dkt. No. 1-1 at 2).

OIG is now investigating "whether Diagnostic and the [other individuals under investigation] solicited, received, or offered remuneration to induce referrals of patients for items or services payable under the Federal Health Care Programs." (Dkt. No. 5 at 23). This conduct is different from Texas Neurodiagnostic's submission of allegedly unnecessary Medicare claims. So the settlement agreement does not include the conduct at issue here.

## IV. CONCLUSION

For the reasons above, the Court **GRANTS** OIG's Cross-Motion to Enforce Administrative Subpoena, (Dkt. No. 5), and **DENIES** Diagnostic's Motion to Quash Subpoena to Diagnostic Healthcare Services, Inc., (Dkt. No. 1).

IT IS SO ORDERED.

Signed on March 1, 2025.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**